8511

STATE v. MALLOY.

1. CONSTITUTIONAL LAW—CAPITAL PUNISHMENT—ELECTROCUTION.—The
act of 1912, 27 Stat., 702, changing capital punishment from hanging
to electrocution, provides a more humane method of inflicting the
sentence and is not, therefore, an *ex post facto* law as to him who
committed the crime of murder before its enactment and tried and
sentenced since.

2. EXCEPTIONS based on grounds not stated in record will not be con-
sidered.

3. EXCEPTIONS to the admission of evidence not shown to have been
prejudicial to appellant will not be considered.
   MR. JUSTICE WOODS *thinks the evidence here admitted was preju-
dicial.*

4. EVIDENCE.—AN INSTRUCTION that "the opinion of experts like any
other testimony in the case must be weighed as other facts are con-
sidered" held to mean if the jury believe the testimony of an expert,
they were not to disregard it.

5. IBID.—CONFESSIONS.—The instruction here that a free and voluntary confession is competent evidence to be considered by the jury, as it was here given in a hypothetical sense, is not a charge on the facts.

6. CHARGE.—An appellant who fails to present a request on a point he thinks applicable to the case, should not complain if the Judge overlooks it.

7. JURORS.—No abuse of discretion having been shown in the Court in standing aside a juror who had been bound over as a witness for the defense by mistake and in allowing another to be presented who had formed an opinion from hearing the testimony at the inquest, exceptions thereto are overruled.

Before SPAIN, J., Marlboro, Spring term, 1912. Affirmed.

Indictment against Joe Malloy for murder. Defendant appeals on the following exceptions:

1. "The Court erred in overruling the challenge to the array of the grand jury and in holding that it was a legal grand jury, when it was drawn from a list not made up according to law, as shown by the admitted facts set out in the plea; and they deprived the defendant of his right to be tried on a bill duly found by a legal grand jury, in violation of the Constitution of the United States and of this State.

2. "The Court erred in refusing to quash the indictment on the ground that it was found by an illegal grand jury; and thereby deprived defendant of the right given him by the Constitution of this State and of the United States to be tried on a valid indictment found by a legal grand jury.

3. "The Court erred in overruling the challenge to the array of the jury as being illegally drawn from lists illegally made up; and thereby he deprived defendant of his right, guaranteed by the Constitution of this State and of the United States, to be tried by a jury of his peers legally drawn and impanelled.

4. "The Court erred in overruling the plea in bar to the infliction of the death penalty by electrocution and the

motion in arrest of judgment, for the reason that when the crime was charged to have been committed the penalty was death by hanging; whereas, the penalty of death by electrocution was substituted by the act of 1912 and was *ex post facto* as to him; and the imposition of the sentence was in violation of the Constitution of the United States and of this State prohibiting the passage of *ex post facto* laws.

5. "The Court erred in allowing the witness, Stephen Toms, over the objection of defendant's counsel, to state that he had told the same story to one Collins before he told the same in Mr. Evans' office; the same being an effort to corroborate the witness by the fact that he had made the same statement elsewhere, and being incompetent and prejudicial and self-serving.

6. "The Court erred in charging that "the opinion of experts is like any other testimony in the case and must be weighed by the jury as other facts are considered," it being a charge on the facts and an invasion of the province of the jury, whose sole province is to weigh the evidence; and the Court cannot direct it as to the method of weighing any kind of evidence.

7. "The Court erred in charging the jury that "the free and voluntary confession of one accused of crime is competent evidence to be considered by the jury in the determination of his guilt or innocence," the same being prejudicial, in that there had been proven alleged confession of the defendant, and the charge tended to impress the jury that such alleged confessions were made, whereas, they were disputed; and the competency of evidence is passed upon when it is admitted, and its use should not be commented upon in the charge, the same being a charge on the facts.

8. "The Court erred in not charging the law of manslaughter, as there were circumstances which might have

indicated a case of manslaughter, and the same should have been defined to the jury.

9. "The Court erred in holding the jurors competent who had formed and expressed an opinion from the evidence given at the coroner's inquest when it was likely that the evidence would be the same on the trial and in not excluding them for that reason.

10. "The Court erred in standing aside the juror, R. B. Crosland, when the only charge was that he had been by mistake bound as a witness for the defense."

See 946 Criminal Code: "When the punishment of death is inflicted upon any person pursuant to the sentence of any Court, the execution shall take place within the jail or the enclosure of the jail of the county wherein such execution shall be made. No one shall be allowed to be present at such execution except the sheriff of the county or his deputy, and his assistants, the clergy, the State solicitor, the attorney or attorneys who defended the convict, the family of the convict, and not more than ten discreet persons to be named by the sheriff; which said ten persons shall be summoned by the sheriff and be required to be present."

### ACT OF 1912.

Section 1. "Be it enacted by the General Assembly of the State of South Carolina, that after the approval of this act by the Governor, all persons convicted of capital crime and have imposed upon them sentence of death shall suffer such punishment by electrocution within the walls of the State petitentiary in Columbia under the direction of the superintendent of the penitentiary, instead of by hanging.

Sec. 2. "The board of directors of the State penitentiary are authorized and required to provide a death chamber and

all necessary appliances for inflicting such penalty by electrocution and pay the costs thereof out of any funds in their hands. The expense of transporting any such criminal to the State penitentiary shall be borne by the county in which the offense was committed.

Sec. 3. "Upon the conviction of any person in this State of a crime, the punishment of which is death, it shall be the duty of the presiding Judge to sentence such convicted person to death according to the provisions of this act and to make such sentence in writing, which shall be filed with the papers in the case against such convicted person, and a certified copy thereof shall be transmitted by the clerk of Court of General Sessions in which said sentence is pronounced to the superintendent of the State penitentiary at Columbia, within not less than ten days of the time fixed by the sentence of the Court for the execution of the same, and in all cases it shall be the duty of the sheriff of the county in which such convicted person is so sentenced, together with one deputy or more, if in his judgment it is necessary, to convey such convicted person to the penitentiary at Columbia, to deliver him or her to the superintendent of the State penitentiary not more than twenty days nor less than two days prior to the time fixed in the judgment for the execution of such condemned person, unless otherwise directed by the Governor, or unless a stay of execution has been caused by an appeal or granting of a new trial or other order of a Court of competent jurisdiction.

Sec. 4. "At such execution there shall be present the executioner and at least two assistants, the penitentiary surgeon and one other surgeon, if the condemned person so desires, an electrician, the condemned person's counsel and relatives, if they so desire, ministers of the gospel, not exceeding three, if they so desire, and not less than twelve nor more than twenty-four respectable citizens of this State, to be designated by the executioner.

Sec. 5. "The executioner and the attending physicians shall certify the fact of such execution to the clerk of Court of General Sessions in which such sentence was pronounced, which certificate shall be filed by the clerk with the papers in the case.

Sec. 6. "The body of the person so executed shall be delivered to relatives, and in case no claim is made by relatives for such body the same shall be disposed of as bodies of convicts dying in the State penitentiary, provided that if near relatives of the person so executed desire that the body be carried to the former home, if within the State, the expenses of such transportation shall be paid by the penitentiary authorities, who shall draw their warrant upon the county treasurer for such county from which said convict came, and said county treasurer shall pay the same and charge the item to Court expenses.

Sec. 7. "That all acts or parts of acts inconsistent with this act are hereby repealed."

*Messrs. Stevenson & Prince,* for appellant, cite: *The act of 1912 providing capital punishment by electrocution is ex post facto as to appellant:* 22 N. Y. 95; Cool. Con. Lim. 379; 107 U. S. 221; 39 N. Y. 418; 22 Kan. 477; 63 N. C. 140; 43 L. R. A. 154; 170 U. S. 341; 115 N. Y. 660; 44 Am. St. R. 531; 7 Am. St. R. 674; 12 Allen 424; 31 Am. St. R. 375; 176 Fed. 976; 134 U. S. 160; 142 U. S. 155; 136 U. S. 436; 31 S. C. 105; 47 S. C. 166; 49 S. C. 443; 137 U. S. 483; 196 U. S. 326.

*Solicitor J. Monroe Spears* and *Messrs. Rogers* and *Townsend,* contra. *Messrs. Rogers* and *Townsend* cite: *Change of punishment from hanging to electrocution since appellant committed the crime is not an ex post facto law as to him:* 7 Ency. 527, 529; 136 Cr. Code; 47 S. C. 174; 119 N. Y. 580; 7 Am. St. R. 674; 137 U. S. 734; 37 Am. St. R.

572; 196 U. S. 495. *Failure to instruct as to manslaughter is no error here, because not requested and evidence does not require it:* 85 S. C. 233; 83 S. C. 258; 66 S. C. 449; 78 S. C. 23; 79 S. C. 125; 58 S. C. 47. *Presenting jurors who had expressed an opinion:* 19 S. C. 85; 36 S. C. 479.

April 7, 1913. The opinion of the Court was delivered by

Mr. Chief Justice Gary. The defendant was indicted and tried in July, 1912, for the murder of Prentiss Moore, on the 24th of November, 1910, and the jury rendered a verdict of guilty; whereupon the Court sentenced him to be electrocuted on the 9th of August, 1912, in the manner provided by the act, approved the 17th of February, 1912, which will be incorporated in the report of the case, together with section 946 of the Criminal Code of 1912, which prescribes the manner in which a person shall be hanged.

The defendant appealed upon exceptions, which will be reported.

The first question that will be considered is, whether the said act which changed the punishment for murder, from death by hanging to death by electrocution, was unconstitutional, on the ground that it was an *ex post facto* law, as to him.

Section 109, Criminal Code of 1902, is as follows: "Whoever is guilty of murder, shall suffer the punishment of death: *Provided, however,* That in each case, where the prisoner is found guilty of murder, the jury may find a special verdict, recommending him or her, to the mercy of the Court, whereupon the punishment shall be reduced to imprisonment in the penitentiary, with hard labor, during the whole lifetime of the prisoner."

Prior to the act of 1912, the mode of execution, when the prisoner was sentenced for murder, was by hanging.

In Cooley's Constitutional Limitations, pages 319-320, the author quotes with approval, the following language of Chase, J., in the leading case of *Calder* v. *Bull,* 3 Dall. 386, as to *ex post facto* laws: "I will state what laws I consider *ex post facto,* within the words and the intent of the prohibition: 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was when committed. 3d. Every law that changes the punishment and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less or different testimony, than the law required, at the time of the commission of the offense, in order to convict the offender. All these and similar laws are manifestly unjust and oppressive. * * * But I do not consider any law *ex post facto,* within the prohibition, that mollifies the rigor of the criminal law; but only those that create or aggravate the crime, or increase the punishment, or change the rules of evidence for the purpose of conviction." The last sentence is quoted with approval, in *State* v. *Richardson,* 47 S. C. 166, 25 S. E. 220.

In the case of *Kring* v. *State,* 107 U. S. 221, it was held, that any law is an *ex post facto* law, within the meaning of the Constitution, passed after the commission of a crime charged against a defendant, which in relation to that offense, alters the situation of the party to his disadvantage; and no one can be criminally punished, except in accordance with the law of force, when the offense was committed.

In that case the Court quoted with approval, the following language from the case of *Hartung* v. *People,* 22 N. Y. 95: "It is highly probable, that it was the intention of the legislature, to extend favor rather than increased severity, towards the convict and others in her situation; and it is quite likely, that had they been consulted, they would have preferred the application of this law to their cases, rather

than that, which existed when they committed the offenses, of which they are convicted. But the case can not be determined on such considerations. No one can be criminally punished in this country, *except according to a law prescribed for his government, before the supposed offense was committed, and which existed as a law, at that time.* It would be useless to speculate upon the question, whether this would be so, upon the reason of the thing; and according to the spirit of our legal institutions, because the rule exists in the form of an express written precept, the binding force of which, no one disputes. No State shall pass an *ex post facto* law, in the mandate of the Constitution of the United States."

The Court also quoted with approval the following language of Mr. Justice Washington, in *United States* v. *Hall,* 2 Wash. C. C. 366: "An *ex post facto* law is one which in its operation, makes that criminal, which was not so, at the time the action was performed, or which increases the punishment, *or, in short, which, in relation to the offense or its consequences, alters the situation of a party, to his disadvantage."*

In *Murphy* v. *The Commonwealth,* 43 L. R. A. (Mass.) 154, it is said: "The objection to *ex post facto* legislation, consists in the uncertainty, which would be introduced thereby, into legislation of a criminal or penal character, and the injustice of punishing an act, which was not punishable when done, or, of punishing it in a different manner than that, in which it was punishable when done.

"But not all retroactive legislation is unconstitutional, as being *ex post facto.* The question in each case is, whether it will increase the penalty or operate to deprive a party of substantial rights or privileges, to which he was entitled, when the offense was committed; or, in short, in relation to the offense and its consequences, will alter the situation, of a party, to his disadvantage." See, also, notes to the case

of *Rooney* v. *North Dakota,* 196 U. S. 319, reported in Am. & Eng. Ann. Cases, 76.

A statute which merely regulates the manner, in which the execution shall be conducted, by prescribing the time and manner of the execution, and the number and character of the witnesses, is not *ex post facto,* though it applies to offenses committed before its enactment. *Holden* v. *Minnesota,* 137 U. S. 491.

"The objection that the later law required the execution of the sentence of death, to take place within the limits of the penitentiary, rather than in the county jail, as provided in the previous statute, is without merit. However, material the place of confinement may be, in case of some crimes not involving life, the place of execution, when the punishment is death within the limits of the State, is of no practical consequence to the criminal. On such a motion he is not entitled to be heard." *Rooney* v. *North Dakota,* 196 U. S. 319.

The foregoing authorities sustain the proposition, that the punishment prescribed by law for an offense, at the time it was committed, can not be changed by subsequent legislation, unless the change is advantageous to the prisoner.

The appellant's attorneys argued, that the act of 1912 was unconstitutional, by reason of the fact, that the place of execution, and the number of witnesses permitted or required by the act of 1912, were changed to the disadvantage of the defendant. The foregoing authorities, also, show, that these objections are untenable. In the language of Mr. Cooley in his excellent work entitled Constitutional Limitations 322: "We have no doubt, the privileges the respondent claims, were designed and created solely, as incidents of the severe punishment, to which his offense formerly subjected him, and not as incidents of the offense." In this respect the statute is analogous to those, which relate to penal administration or prison discipline, and are not unconstitutional, even though the effect may be to enhance

the severity of the confinement. *Murphy* v. *Commonwealth,* 172 Mass. 264.

We now come to the pivotal question, whether the act of 1912 changing the punishment for murder from death by hanging to death by electrocution, shows that its tendency is to ameliorate the punishment by hanging.

In the case of *In re Kemmler,* 136 U. S. 436, the Court had under consideration the question, whether the New York statute providing that "punishment of death, must in every case, be inflicted by causing to pass through the body of the convict, a current of electricity, of sufficient intensity to cause death," was obnoxious to the provision of the Constitution, prohibiting the infliction of cruel and unusual punishment.

The first step which led to the enactment of the law in that State, was the message of the Governor, in which he said: "The present mode of executing criminals by hanging, has come down to us from the dark ages, and it may well be questioned, whether the science of the present day, can not provide a means, for taking the life of such as are condemned to die, in a less barbarous manner. I commend this suggestion to the consideration of the legislature." The legislature accordingly, appointed a commission to investigate and report "the most humane and practical method known to modern science, of carrying into effect the sentence of death in capital cases." This commission reported in favor of execution by electricity. They also reported a proposed bill, which was enacted. Mr. Chief Justice Fuller, in delivering the opinion of the Court, said: "Punishments are cruel, when they involve torture, or a lingering death; but the punishment of death is not cruel, within the meaning of that word, as used in the Constitution. It implies there something inhuman and barbarous—something more than the mere extinguishment of life. The Courts of New York held, that the mode adopted in this instance, might be said to be unusual, because it was new, but that it could not

be assumed to be cruel, in the light of that common knowl-
edge, which has stamped certain punishments as such; that it
was for the legislature to say, in what manner sentence of
death should be executed; that this act was passed, in the
effort to devise a more humane method of reaching the
result; that the Courts were bound to presume, that the leg-
islature was possessed of the facts, upon which it took
action; and that by evidence *aliunde* the statute, that pre-
sumption could not be overthrown. They went further,
and expressed the opinion, that, upon the evidence the legis-
lature had attained by the act, the object had in view, in its
passage. * * * Treating it as involving an adjudication, that
the statute was not repugnant to the Federal Constitution,
that conclusion was so plainly right, that we should not be
justified in allowing the writ, upon the ground that error
might have supervened therein. * * * The enactment of this
statute was, in itself, within the legitimate sphere of the
legislative power of the State, and in the observance of those
general rules, prescribed by our systems of jurisprudence;
and the legislature of the State of New York, determined
that it did not inflict cruel and unusual punishment, and its
Courts have sustained that determination. We can not per-
ceive that the State has thereby abridged the privileges or
immunities of the petitioner, or deprived him of due process
of law.

"In order to reverse the judgment of the highest Court of
the State of New York, we should be compelled to hold, that
it had committed an error, so gross, as to amount, in law, to
a denial by the State, of due process of law, to one accused
of crime, or of some right secured to him, by the Constitu-
tion of the United States.

"We have no hesitation in saying, that this we can not do,
upon the record before us." The writ of error was accord-
ingly denied.

It is true the provision of the United States Constitution
now under consideration, was not before the Court in that

case, but the decision clearly shows, that the Court regarded electrocution, as a more humane method of punishment, than that by hanging. It would have been surprising if the Court had reached any other conclusion, after considering the manner in which an execution by hanging is conducted. The rope around the prisoner's neck must be of the proper length, and so adjusted that when he drops from the scaffold, his neck will be broken, thus destroying the structural formation of the body. But suppose the rope is not of the proper length, or the noose is not properly adjusted, then there are instances on record, where the head was completely severed from the body, when the convict dropped from the scaffold. There are also numerous instances, where the neck was not broken, and the convict died of strangulation, after several minutes of consciousness. We merely mention the agony, which must have been suffered, during strangulation as indicated by the bulging eyes, and draw the curtain over such a picture. Suffice it to say, that this Court is satisfied, that electrocution is a more humane method of execution than by hanging.

The exception raising this question, is, therefore, overruled.

The ruling of the Court upon the former appeal in this case, shows that the first, second and third exceptions can not be sustained.

The fourth exception has already been considered.

There are two reasons, why the fifth exception can not be sustained. In the first place, the grounds of objection were not stated, and, in the second place, it has not been made to appear, that the rights of the defendant were thereby prejudiced.

The sixth exception is overruled, for the reason that his Honor, the presiding Judge, simply meant to tell the jury, that if they believed the testimony of an expert, they were not to disregard it, merely because the witness was testifying as an expert.

The seventh exception can not be sustained, for the reason that the remark of the presiding Judge was general, and was to be understood, as if it had been preceded by the word "if."

The eighth exception is overruled, for the reason that the defendant failed to present a request, to charge the proposition, for which he now contends.

The ninth and tenth exceptions can not be sustained, for the reason that the record fails to show an abuse of discretion, on the part of the presiding Judge, in ruling upon the competency of the jurors therein mentioned.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed, and that the case be remanded to the Circuit Court, for the purpose of having another day assigned, for carrying into execution the sentence of the Court.

MR. JUSTICE WOODS, *dissenting.* Early in the morning of 24th November, 1910, Guy Rogers, a youth of about seventeen years, and his friend, Prentiss Moore, several years younger, left the homes of their parents, in Bennettsville, for a morning's hunt, with the expectation of returning in time for dinner. Upon their failure to return, the community united in a long and harrowing search, which resulted in finding the bodies of both the boys in a ditch about eleven hundred yards from the house of the defendant.

Prentiss Moore was killed by a gunshot wound in the back near the shoulder blade. The facts that the shot were somewhat scattered, and that there were no powder burns indicated that the shot was fired at least a little distance off. While the wound was necessarily fatal, some minutes might have intervened before death. The gunshot which killed Guy Rogers seems to have entered, in almost a solid mass, in front near the left nipple, making powder marks on the

body, and leaving the gun wad sticking to the wound. Death must have been almost instantaneous. The body of Guy Rogers was lying in the ditch, and that of Prentiss Moore leaning against the side of the ditch. The one double-barrel shotgun which the boys had was lying on the side of the ditch, and near by was an empty shell.

The defendant was indicted and tried for the murder of Gay Rogers, and this appeal is from his conviction and sentence to death.

I concur in the reasoning and the conclusions of the Chief Justice as to all the exceptions except the fifth.

The case of the State depended on some circumstances alleged to be unfavorable to the defendant, but mainly on the testimony of Charlotte Easterling and Stephen Toms, both negroes, as to confessions to them by the defendant that he had killed the boys.

The witness, Charlotte Easterling, as was agreed on all sides, was utterly discredited by her numerous contradictions of herself. These contradictions culminated in her testifying at the trial to a confession of the defendant, and then confessing in private to the solicitor and on the stand that no confession had been made to her. The witness, Stephen Toms, then testified to confessions made to him, and was allowed to bolster up his statement by stating that at a certain time and place he had told one Collins of the defendant's confession. This testimony was clearly incompetent. *State* v. *Thomas,* 3 Strobh. 269; *State* v. *Scott,* 15 S. C. 434; *State* v. *Gilliam,* 66 S. C. 419, 45 S. E. 6; *State* v. *McDaniel,* 68 S. C. 304, 47 S. E. 384; and I am convinced that it was also prejudicial, especially in view of the fact that the defendant introduced testimony tending strongly to show that Toms was a professional witness having a bad reputation for veracity.

It seems to me that careful consideration of the evidence is convincing that the tragedy was one of deep mystery— requiring on the part of the jury most careful and anxious

consideration of every particle of evidence before they could reach a verdict. They had to answer these serious questions: Were the boys murdered and thrown into the ditch, or was the tragedy due to an unusual and unexplainable accident? Was there any sufficient motive for the defendant to commit such a dreadful and monstrous crime? Were the circumstances proved by creditable testimony affecting the defendant not consistent with his innocence? Were the confessions attributed to defendant really made by him, or were the witnesses who testified to them shown to be unworthy of belief? It cannot be doubted that the testimony as to the confessions was the strongest adduced against the defendant; and when the character of the witnesses from which this testimony came is considered, the conclusion seems irresistible that it was the right of the defendant to have excluded all incompetent testimony as to the confessions imputed to him, and denied by him, which may have contributed to the verdict.

This Court has set its face against technical objections to testimony and appeals depending on errors which do not affect the merits. But I am forced to the conclusion that in a case so full of mystery, justice requires that no material testimony set down by the law as incompetent should be admitted to effect the conclusion of the jury.

For this reason, I think the judgment should be reversed and the cause remanded for a new trial.

*This case was held up on petition for writ of error to United States Supreme Court.*—REPORTER.