# STATE *v.* WATTS

No. 2899

August 6, 1930.                                    290 P. 732.

*J. W. Dignan,* for Appellant:

458

*Merwyn H. Brown,* District Attorney, *M. A. Diskin,* Attorney-General, and *Wm. J. Forman,* Deputy Attorney-General, for the State:

## OPINION

By the Court, SANDERS, J.:

In September, 1929, Rosa Watts was charged in an information filed in the court below with shooting and killing Rollin Watts, nicknamed "Doc Watts," her husband, in Winnemucca, Humboldt County, Nevada, on the 18th day of June, 1929. Although the proof shows the accused to have been an accessory to the homicide, she was informed against as a principal because the distinction between principal and accessory is abrogated by statute. Section 7071, Revised Laws.

After an extended trial the jury returned this verdict:

"We, the jury in the above-entitled cause, do find the defendant, Rosa Watts, guilty of murder in the first degree, and do hereby fix the penalty at life imprisonment."

Thereafter, the accused filed her notice of intention to move for a new trial. Subsequently, the motion was denied and overruled. Thereupon, judgment was pronounced upon the verdict and the accused was sentenced to confinement in state prison for life. Thereafter, the accused perfected her appeal to this court from the judgment and from the order denying and overruling her motion for new trial.

The first and principal ground alleged for the reversal of the order denying the motion for new trial is the insufficiency of the evidence to support the verdict.

The record is voluminous and to set out, or even attempt to review the testimony of the numerous witnesses in detail, would extend this opinion to an unreasonable length. Therefore, a summary of the facts and circumstances attendant upon and surrounding the alleged homicide stated in narrative form must suffice.

The record discloses that Rosa Watts and Glenn A. Trousdale intermarried in the year 1914. Their marital

domicile for the greater part of their married life was in Winnemucca, Humboldt County, Nevada, where they purchased a home situate on the corner of West First Street and Aiken Street. In the rear of the residence were six cabins owned and rented by them.

On May 4, 1929, Rosa Trousdale was divorced from her husband. At the time of the divorce the spouses entered into a property settlement, whereby the husband was to receive certain personal property and the wife a deed to their real estate upon the payment to the husband of $2,500, payable in monthly installments of $60 per month. The contract and deed to the property was placed in escrow in the First National Bank in Winnemucca. A few days thereafter the divorced husband and wife, together with Rollin Watts, went to the First National Bank and Rollin Watts then and there paid Glenn A. Trousdale the sum of $2,500, in full of the property contract settlement, and Rosa Trousdale received the deed then in escrow and had it placed upon record.

On the 11th day of May, 1929, Rosa Trousdale intermarried with Rollin Watts.

On the morning of June 18, 1929, at or about 3:30 o'clock a. m., Rollin Watts was found on the front porch of his residence in a bed occupied by him and his wife with a bullet hole in the top of his head, practically on the middle line of the skull and in line with a line drawn from ear to ear. He was removed to the county hospital in Winnemucca, where he died on the 14th of August, 1929, from the effects of the wound received on June 18, 1929.

Caledonia Swezy, a witness for the state, testified that on the night of June 18, 1929, she was awakened by loud and angry voices, men's voices and a woman's voice; that she heard a pleading voice say: "Let go," or "Let me go"; that she heard a shot and a groan or moan; that she heard a woman say: "Why did you do it?" several times, and also exclaim: "Oh, Doc." The witness testified that after hearing the shot she saw Rosa Watts come out of the back door of the Watts residence and stand as if hesitating in the back yard

and then turn as if going back into the house, and then come out of the back on First Street and go across the street to the Swezy residence and call Doctor Swezy for aid.

Doctor Swezy, a witness for the state, testified that when he arrived at the Watts residence he found Rollin Watts lying on the bed on the front porch; that Rosa Watts at the time said to him that Rollin had attempted to commit suicide. He further testified that when he came upon the porch Rosa Watts went over to the bed and said: "You did it yourself, Rollin. Tell him you did it yourself, didn't you." The witness testified that he found a .38 caliber Iver Johnson pistol lying beside the bed near the head of the bed. .

Frank Diehl, a witness for the state, testified that he lived in the Bergwin cabin in the rear of the Watts residence; that on the morning of the 18th of June he heard what sounded to him to be two men and a woman in an argument and that within a short time he heard a shot and then heard a woman say: "Oh, my God, why did you do that?" and that within a short time he heard a noise as if someone was crawling over a fence or shed in the rear of the Watts residence.

E. L. Bogart, a witness for the state, testified that he was sleeping in cabin No. 5 in the rear of the Watts residence on the morning of the 18th and that he was awakened by a noise, and that within a short time he saw Rosa Watts cross the street from the rear gate to the Swezy residence, and that a few minutes before seeing Rosa Watts crossing First Street he heard a scraping noise like someone drawing themselves up over a shed or fence in the rear of the Watts residence about twenty feet from where he was sleeping, which sounded to him as if someone was crawling over the back coal shed.

Mrs. Laura Campbell, a witness for the state, testified that on the morning of June 18th, about 3:25 a. m., she heard someone close the door of the residence of Mrs. Ella Trousdale, the mother of Glen A. Trousdale, where the latter was living at the time, and she heard

the front screen door slam and someone walk to the front gate and someone walk down in front of her house, which was in the direction of the Watts residence.

In the forenoon of June 18th Erling Prout, deputy sheriff visited the Watts residence to make an investigation of the shooting, where he was met by Rosa Watts who, in response to questions put to her by the witness Prout, stated that "Doc" had shot himself, meaning the deceased, and upon further inquiry she produced the gun from a dresser drawer and gave it to the witness. The gun contained four loaded shells and one empty shell. She stated to the witness that "Doc" took the gun to bed with him; that there was someone prowling around the night before and "Doc" said he was going to take the gun to bed to protect him. On another occasion at the Watts residence Rosa Watts stated to the witness Prout that "Doc" was out riding in the afternoon and in the evening that they both went riding after supper and got back about half past eight; that "Doc" went to bed somewhere around nine o'clock and she a little while afterwards; that they talked a bit and that she went to sleep and she never woke up until the shot woke her up in the morning. She stated that when the shot woke her up she jumped out of bed, looked around, saw the blood on "Doc" and that she ran to the telephone, and could not get any answer and then went out the front door and beat it across the street to get Doctor Swezy. She said she got the doctor and the doctor came over and afterwards Mr. Spinner and Mrs. Spinner and Mrs. Swezy came over and that "Doc" was taken to the hospital.

On cross-examination the witness Prout stated that he visited Rollin Watts at the hospital on the 19th and went there very nearly every day to see him. The first conversation the witness had with the deceased was on the 20th. On the 20th the witness visited Watts in response to a message delivered over the 'phone by the nurse that Watts wanted to talk to him. The conversation between them was substantially as follows:

"Doc, do you know who I am. A. Yes.

"Q. I am here to help you. If there is anything possible for me to do let me know. Doc, did you shoot yourself? A. No.

"Q. Do you know who did shoot you? A. Yes.

"Q. Who was it, Doc? A. Glenn Trousdale.

"Q. Did you see him? A. Yes.

"Q. Where was Glenn? A. ———. Ice water.

"Q. Did Rose shoot you? A. No."

This conversation was transcribed by the district attorney and was admitted in evidence on the request of counsel for the defendant.

About the hour of seven o'clock on the evening of the 20th District Attorney Brown, Doctor Swezy and the witness Prout visited Watts. The witness Prout testified that on this visit he wrote out some questions and asked them to "Doc," to which questions "Doc" wrote his answers. The questions and answers were as follows:

"Q. Who shot you Doc? A. Glen Trousdale.

"Q. Did you see him? A. I did.

"Q. Did you ask for mercy? A. I did, yes.

"Q. What room was he in when shot? The answer to this question is an unintelligible scrawl.

"Q. Do you realize you are seriously ill? A. Yes.

"Q. Where was Rose? A. In answer to this question Watts wrote an answer in his own handwriting—three plain and one unintelligible word as follows: In bed o-r-e-n-t-o-r-e back. It is read by counsel for the accused as intended to mean, 'In bed over in back.'

"Q. Were you in bed when shot? A. Yes."

The witness testified that Watts was quite weak, and when he made an attempt to answer the last question he laid the pencil down. The paper which contained the questions and answers was admitted in evidence upon the request of the counsel for the defendant on the cross-examination of the witness Prout.

The witness stated that on the 22d he had a telephone call from the nurse at the hospital stating to him over the 'phone that she was ordered out of the room and

that the witness, together with the district attorney, went to the hospital, where they found Rosa Watts in Rollin Watts's room; that Mrs. Watts tore up some writing that she had made upon a paper and that the district attorney asked what it was on the paper and she mumbled something that the witness did not understand. The district attorney asked for the paper, but she kept tearing it up and that the witness lead her out of the room into the hall and in so doing she turned around to get her hat and she stepped over and dropped the paper into the toilet. The district attorney reached down and got the paper and she got her hat and came down with the witness to the sheriff's office.

Thereafter Rosa Watts and Glenn A. Trousdale were charged with the crime of assault with intent to kill and were placed under arrest on the evening of the 20th.

On July 18, 1929, Watts had recovered sufficiently so that he was able to be brought before the grand jury. A few days later he became worse and gradually began to sink. On July 27, 1929, a statement from him was taken which was reduced to writing, consisting of questions and answers propounded to him by the district attorney and signed by the deceased, and was introduced and admitted in evidence on behalf of the state as a dying declaration. The statement reads as follows:

"Brown: Good morning, Doc, how do you feel today? A. No good.

"Brown: Do you think you are getting better?

"Watts: No, I am worse.

"Brown: Do you feel that you are going to get well?

"Watts: No, I do not.

"Brown: Do you feel that you are going to die?

"Watts: Yes, I do.

"Brown: If you feel that you are not going to get well, would you like to make a statement of the circumstances connected with the shooting?

"Watts: Yes.

"Dr. Swezy: Yes, Doc, you are in a serious condition, and it does not look like you would recover.

"Watts: I know it.

"Brown: In making this statement do you make it realizing that you are failing in health, and that you are about to die?

"Watts: I do, yes.

"Brown: Do you make this statement freely and voluntarily?

"Watts: Yes, I do.

"Winnemucca, Nevada,
"Time, 10:50 a. m.                    July 27, 1929.
"Humboldt County Hospital.

"I, Rollin Watts hereby make this statement with regard to the gunshot wound that I received on the morning of June 18th, 1929, realizing that I am failing in health and that I am about to die, and I do so freely and voluntarily.

"Do you know who shot you, Rollin?

"Yes.

"Who did shoot you?

"Glenn Trousdale.

"Did you see Glenn Trousdale that morning?

"Yes, I did.

"How did he come in the house?

"He came in the front porch screen door.

"Did you hear him?

"Yes, I heard a noise, I heard him unlock the door.

"What did you see?

"I looked over the curtain and saw him come to my bed on the porch.

"When he came to your bed what did he do then?

"He reached down and picked up the pistol at the head of the bed on the floor.

"Where did he go then after he picked up the pistol?

"He went in the front door into the front room and then I heard him go into the bedroom behind me.

"What happened then?

"I heard a shot, I was shot then.

"When you were shot, Rollin, how was the window behind you.

"It was up, open.

"Where was Rosa when you were shot?

"She was in bed, laying on my knees holding me.

"Did you take the pistol to bed with you the night before when you went to bed?

"Yes, I got it from the dresser in the bedroom and put it under the bed at the head of the bed on the floor on the porch.

"Is that the pistol that Glenn picked up and took with him when he went into the bedroom?

"Yes.

"Why didn't you get the pistol?

"Because Rosa was laying on my knees, holding me.

"Did you try to get the pistol?

"Yes.

"If she had not been laying on your knees could you have gotten the pistol?

"Yes, I could.

"I have made the above statement realizing that I will not get well and in face of impending death.

"The above statement is a true and correct statement of the circumstances at the time I was shot.

"Rollin Watts.

"Witnesses:

"Chas. E. Swezy, M.D.

"S. G. Lamb.

"Nora Forde, R.N.

"Merwyn H. Brown.

"Brown: Can you sign this statement now Doc?

"Watts: Yes, I will try.

"Brown: Now, Doc, before signing this statement, do you do so realizing that you will not get well and in face of impending death?

"Watts: Yes, I do.

"Brown: Is this statement a true and correct statement of the circumstances at the time you were shot?"

Thereafter, Watts continued to grow worse and on certain days was unconscious. On the afternoon of August 9, 1929, a second statement was taken in which Watts verified and confirmed the first statement as a whole. This statement was also introduced and admitted in evidence as a dying declaration. The statement follows:

"Winnemucca, Nevada,
"4: 45 p. m.                    August 9, 1929.
"Q. How are you today,. Doc?   A. Bad.
"Q. Do you still feel that you are going to die?   A. Yes.
"Q. Do you remember making a statement about two weeks ago in regard to your gunshot wound?   A. Yes.
"Q. Would you like to make a statement again, now Doc?   A. Yes.
"Q. Do you make this statement realizing that you are dying and that will not get well?   A. Yes.
"Q. Do you make this statement freely and voluntarily?   A. Yes.
"Q. I will read you the statement you made then and will you tell me if it is your own statement now and true and correct?   A. Yes."

The statement, as previously made was then read to Watts and affirmed by him as being a true and correct statement of the circumstances at the time he was shot.

Referring to the nature of the wound as relating to the question of suicide, Doctor Swezy testified that on the morning of the 18th of June, about the hour of four o'clock he made a superficial examination of the deceased. He found a bullet hole in the top of the head of the deceased and the frontal part of the forehead swollen, a broken bone under the skin but the skin was not perforated. Afterwards he found another hole after he was taken to the hospital. On his examination at the hospital the witness stated that he found no powder marks, powder burns or scorches. Witness stated that the wound was on the summit of the head on a line drawn from one ear to the other. The entrance was a trifle to the right, then at left over on the middle line and then down an inch and a quarter to the front, and a trifle to the right was a little opening with a little tab of scalp hanging to it. The witness testified that he made an incision of about four inches right along over the top of the head and retracted the tissues so that he could explore the condition and take out the small pieces of bone and any tissues or anything that might have to come out.

The witness testified that after the death of the deceased he performed an autopsy upon his body and that as the result of the investigation he found that the bullet had gone through the right lobe of the brain. In one place it touched over on the left lobe a little and that in the opinion of the witness the cause of the death was infectious meningitis caused by the introduction of an infection caused by a bullet wound in the top of the head of the deceased.

Professor Edward O. Heinrich, an expert witness on the part of the state, examined the pistol and shells in it, which was found beside the bed. He also examined the pillow and lower sheet covering the bed. He testified that he failed to find any evidence of powder marks or burns upon any of the bedclothing in evidence. He further testified that the bullet removed from the head of Watts and the portion found on the sill of the screen porch was a .38 caliber S. & W. bullet and exactly like the loaded bullets found in the pistol, and that the bullet had been fired from a pistol of the same type as the one found beside the bed. He testified that from an examination of the blood stains on the pillow slip and pillow, the sheet and corner of the sheet and the window-pane back of the bed and the bullet marks found near the ceiling at the foot of the bed where the other portion of the bullet had hit, and the nature of the wound, it was his opinion that Watts was lying on the pillow at the time he was shot and further that the window at the rear of the bed was open about eight inches.

Glenn A. Trousdale died on the 25th day of September, 1929. After a preliminary examination on that date, to wit, September 25, 1929, an information was filed against Rosa Watts charging her with murder in the first degree.

■ The record discloses that when the state offered in evidence the two dying declarations of the deceased, counsel for the defendant objected to their admission in evidence upon the ground that no proper foundation had been made, in that the testimony did not show that the purported statements were dying declarations or that the statements were honestly or fairly taken, and

there was no evidence to show that the statements were taken when the deceased believed, or knew, or thought that he was going to die, and that he had abandoned every hope of recovery, and further that the statements were not the statements of Rollin Watts, or that he was conscious of the fact or any of the facts attempted to be set out in the alleged dying statements. In support of this objection, counsel on both sides were privileged to introduce testimony of witnesses in the presence of the jury. Upon the conclusion of the testimony, the declarations of the deceased were admitted in evidence as dying declarations. We find no error in their admission.

It is argued that the dying declarations of the deceased were insufficient to warrant or sustain the conviction of the defendant, because of the contradictory, conflicting and inconsistent statements of the declarant. In support of this contention it is pointed out that the deceased in his dying declarations stated in substance that at the time of the shooting the defendant was in bed lying on his knees holding him, and that he did not get the gun because the defendant was lying on his knees holding him. Whereas, in his prior statements made to the witness Prout, the declarant stated that at the time of the shooting Rosa was in bed over back, meaning that she was lying in bed back of the deceased at the time of the shooting.

██ We are in accord with the rule established by the great weight of authority that dying declarations are open to impeachment upon any ground and by any means which the law regards as legitimate to employ to impeach a living witness and discredit his testimony. Liddell v. State, 16 A. L. R. 405, note. But it is equally well settled that, if dying declarations have been admitted in evidence, the weight to be given them is a matter exclusively for the jury. 3 Wigmore on Evidence (2d ed), sec. 1446. It is the duty of the jury to weigh all the declarations and to determine which, if either, is to be believed. They are the judge of the credit as in the case

of all other testimony by all the circumstances attendant upon and surrounding the declarations.

It was the contention of the defendant throughout the trial that the deceased shot himself with suicidal intent. As a witness in her own behalf, she, in detail, gave her reasons for so testifying from the acts, conduct, health and the mental condition of the deceased at the time of the shooting, and his previous threats to commit suicide because of the consciousness of his wrong done in breaking up the home of the Trousdales. Her testimony in this regard, however, was not persuasive.

Further, the evidence of the nature of the wound as related to the question of suicide tends to refute the testimony of the defendant that the deceased shot himself. It was for the jury to consider and determine the question.

■■■ Counsel for the defendant also contend that, aside from the conflict in the evidence and the utter incredibility of the dying declarations and the inherent improbability that the wife of the deceased aided and abetted in the shooting that resulted in her husband's death, the jury's determination of the defendant's guilt is not conclusive upon this court and the judgment should be reversed. The answer to this question is that the weight and sufficiency of the evidence in homicide cases as in other criminal proceedings are questions for the jury and their verdict shall not be disturbed on appeal if there is evidence to support the verdict. Under our constitution, article 6, section 4, and Revised Laws, section 7287, evidence cannot be weighed by this court if there is substantial evidence to support the verdict. State v. Boyle, 49 Nev. 386, 248 P. 48.

■■ We agree with counsel for the defendant that one may not be convicted upon mere suspicion or upon evidence which leaves the question of criminal agency conjectural, if not reasonably doubtful, but from all the evidence we are justified in disposing of the main contention of the defendant, that the evidence is of such character that the jury could say from it that in

their judgment no reasonable doubt of the defendant's guilt existed.

■ It is contended that the court erred in instructing the jury (instruction No. 28) relating to expert testimony, which reads as follows:

"While you are not bound by the testimony of expert witnesses, still, in considering such testimony, the professional standard and experience of such witnesses must be taken into consideration in arriving at a verdict; and you should consider the character, the capacity, the skill, the opportunities for observation, the state of mind of the expert, the nature of the case and all its developed facts. The opinions of experts are to be considered by you in connection with all other evidence in the case. You are not to act upon them to the exclusion of other testimony. You are to apply the same rules to the testimony of experts that are applicable to other witnesses in determining its weight. Taking into consideration the opinions of experts and giving them just weight, you are to determine for yourselves from the whole evidence whether the defendant is guilty as she stands charged beyond a reasonable doubt."

It is contended that the instruction is erroneous, for the reason that by it the court pointed out certain testimony in the case and instructed as to its weight. The instruction is not erroneous. Epps v. State (Ind.), 1 N. E. 491; State v. Malloy (S. C.), 78 S. E. 995. The court could properly instruct as to the testimony of expert witnesses so as to inform the jury that they should not disregard such testimony merely because given by experts. The instruction does not tell the jury to give little or great weight to the opinion of the experts but to give them "just weight." This is in effect telling the jury to give the opinions such weight as they may deem them entitled to, be it little or great or of no weight whatever.

We have examined and considered the other alleged assignments of error and find them to be without merit.

The judgment and order appealed from are affirmed.