# STATE *v.* WATTS

No. 2899

## ON PETITION FOR REHEARING

December 2, 1930.

*Per Curiam:*

Rehearing granted.

## ON REHEARING

February 18, 1931.                    296 P. 26.

*J. W. Dignan* and *P. A. McCarran,* for Appellant.

## OPINION

By the Court, GUILD, District Judge:

The information in this case, filed in September, 1929, charged the defendant, Rosa Watts, with shooting and killing Rollin Watts, nicknamed Doc Watts, her husband, at Winnemucca, Humboldt County, Nevada, on the 18th day of June, 1929.

■ One may be a principal in a crime of homicide even though he do not fire the fatal shot. If he be present, aiding and abetting by act or deed, he is a principal.

"In a statute providing that one who aids, abets, or procures another to commit a crime may be prosecuted the same as the principal, the word 'aid' means to help, assist, or strengthen; the word 'abet' to encourage, counsel, induce, or assist, and the word 'procure' means to persuade, induce, prevail upon or cause." 16 C. J. 130; State v. Snell, 5 Ohio Dec. 670, 2 Ohio N. P. 55.

"No distinction shall exist between an accessory before the fact and a principal in the first and second degree in cases of felony and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, shall hereafter be prosecuted, tried and punished as principals, and no other facts need be alleged in any indictment or information against such an accessory than are required in an indictment or information against his principal." R. L. Nevada 1912, sec. 7071, as amended; Stats. 1919, p. 419, c. 232, sec. 18; section 221, Criminal Practice Act.

A jury trial was had, and as a result the defendant, Rosa Watts, was found guilty of murder of the first degree, and the penalty or sentence was fixed at life imprisonment. In due course a motion for a new trial was made, and thereafter refused. An appeal from the order denying a motion for a new trial was taken to this court, and by an opinion filed on the 6th day of August, 1930, the judgment of the lower court was affirmed.

A rehearing in the matter was thereafter granted by

this court, the matter being now before the court on the rehearing.

■ The sole question presented for our consideration is: Is there any substantial evidence in the record to support the verdict of the jury?

It is most strenuously urged upon the part of appellant that there is no substantial evidence to support the verdict, for the following reasons: First, that Watts committed suicide; second, that it was impossible for defendant to have aided and abetted in the commission of the crime, (a) because of the physical improbability of her being able to hold the deceased from rising in bed, and (b) because for her to have done so, by the nature and position of the wound of the deceased, she would have placed herself in a hazardous position and in line with the course of a bullet, if the deceased was shot by a person through the window situated at the head of the bed; and, third, that because of the nature of the wound that Watts received and his weakened condition his brain deteriorated very materially and his mentality was not sufficient to justify the introduction of the so-called dying statements taken from him, and there was a strong likelihood and possibility of his laboring under a hallucination by reason of a purported weakened condition of his brain at the time said statements were made.

First, as to the theory of suicide, we are unable to reach such a conclusion from our examination of the evidence and from the demonstration made by counsel for the appellant before the court. It seems not impossible, but highly improbable, that one contemplating or having a suicidal intent would have placed himself and the gun in such an awkward position as to bring about the result of the wound and the position of the wound which Watts received.

Mr. Justice SANDERS, in his opinion, 52 Nev. 462, et seq., 290 P. 732, has given quite an extensive summary of the facts and circumstances attending upon and surrounding the alleged homicide, but in view of the importance of the case and the strenuous and urgent argument

of counsel for the appellant, it is deemed necessary to enlarge upon this summary by perhaps repeating and adding a few additional facts and circumstances in the case.

The testimony of Dr. Chas. E. Swezy, who was qualified as a practicing physician and surgeon over a period of time since June, 1908, as to the position of the wound, and his testimony and that of the autopsy physician, Dr. Pope, in corroboration as to the position of the wound, and the testimony of Prof. E. L. Heinreich, a recognized authority as a consulting criminologist, as to the probable position of the head of the deceased upon the pillow, would seem to discredit a speculative theory of suicide. Dr. Swezy testified, in part, as follows:

"A. It (the wound) was on the summit of the head on a—in a line—a line drawn from the opening of one ear to the other ear, directly over the head would pass over the center of it. The entrance was a trifle to the right, the middle of it. The, it lapped over on the middle line. Then down, there was a little furrow there, and an inch and a quarter to the front and a trifle to the right was a little opening there with a little tab of scalp hanging to it, more like an arrow point or a pencil point had come out through there; and I made my incision about 4 inches, 4 or 5 inches along over the top of the head from before backwards, and had the tissues retracted so I could explore the condition there, and take out the minutest pieces of bone and any tissues or anything that might have to come out."

"A. And then I made an incision across the front of the head here, opened that up about an inch and a half above the eye brows, and retracted that, and found the bone all shattered there, cracked loose. I removed what loose pieces I thought ought to come out, and when I got it cleaned out, pieces of brain, particles of brain, I took my gloved finger and went in there gently and felt the bullet in the right lobe of the brain, and I took— I said to Dr. Pope and the nurses, I said, I believe that is the bullet, and I took a small pair of forceps and went in there and brought out this fragment of the bullet."

The testimony of this witness with reference to the autopsy performed upon the body of the deceased is to the effect that when the autopsy was performed they opened up the brain, found the path of the wound through the right lobe of the brain, and in one place it touched over on the left lobe a little; and found the necrosis, posterior to it, and found the effect of super-action pus; that there was a devitalization along the path of the bullet; that other parts of the vital organs were examined and there was no evidence of any diseased process; and that the deceased came to his death by means of a gunshot wound which had produced infectious meningitis. This testimony was corroborated by Dr. Pope.

Prof. Heinreich, after being qualified, testified that he had made an examination of the revolver, cartridges, pieces of lead, or piece of bullet extracted from the wound of the deceased, and the fragment of bullet found near the ceiling in the upper window sill by the witness Brown, and the premises where the shooting took place, the pillow slip, and a portion of the sheet from off the bed, and had made an examination and study of the various blood stains appearing on the several exhibits, and had visited the patient at the Winnemucca hospital during his lifetime, and had made a casual examination of the wound on the deceased's head. From the examinations and calculations he was able to testify as to a possible position of the deceased in the bed at the time of the shooting. This testimony, in part, is as follows:

"A. On the pillow, pressed into the pillow case and held in shape by the coagulation and drying of the blood, surrounded by an area of clotted blood, there is the imprint of the back of the head which shows the position of the head as associated with the large amount of bleeding which covers the pillow and has been drawn through the texture of the cloth of the pillow case. Down in front connected with the blood stain on the sheet there is the direct line of drainage and the crease in the pillow in the front side showing the manner in

which the pillow was creased and crimped from the weight of the bleeding man upon the pillow. Over beyond the blood stain, and just to the right, as you look at the pillow from the rear of that drainage line of blood which connects the pillow case with the sheet, near the head of the bed, there are eight tiny blood stains. These blood stains are of a different character from the large stain on the pillow case made by flowing blood, and are the kind of stains made by a spurt of blood from a wound. These tiny drops of blood in this position, from these I find that the head was in this same position at the beginning as well as the end of the bleeding. These tiny drops show the beginning of the bleeding, position of the head and the total smear, and especially around the area mark on the pillow case by the head, show the end position of the bleeding condition. The drip of blood across the pillow on the back, across the edge of the sheet and across the mattress fix the position of the pillow with reference to the sheet. The nature of the wound in the cranium in which one-half of the bullet went inside the head, and the other portion rode along the top of the skull under the scalp and then came out and struck a point above the foot of the bed, plus or minus 8 feet above the floor, and the condition of the bullet itself shows that the bullet struck the curved surface of the skull at an angle which caused it to turn and to be cut by the projection of the point of the breaking of the skull against which the bullet was moved, allowing the bullet to be cut in such a manner that half of it went into the skull and half was deflected by the cranium into the position near the ceiling and that this projectory from the skull to the ceiling, following along the line of the point of entrance and point of exit of the portion of the bullet which went into the ceiling, Plaintiff's exhibit No. 6, I believe, fixes the direction in which the face was turned and *the head was tilted at the time of receiving the shot.*"

This same eminent authority, and also Dr. Swezy and others, testified that there were no powder marks nor powder burns either upon the pillow slip, the sheet, or

any part of the head of the deceased. We conclude that the jury, who heard all of the evidence and who were the judges of the weight and credibility to be given to the testimony of the witnesses, had ample justification in rejecting the theory of suicide.

Second, as to the physical improbability of the appellant being able to hold Watts while being shot: This point is perhaps subjected to more speculation and conjecture upon the part of counsel than any other point in the entire case (unless it might be the mentality of the deceased). Appellant asks the question as to how it would be possible for a woman of the physical build of the appellant being able to hold a strong man of the physical build of the deceased from arising from his bed, by lying across his knees or holding his knees. Mr. Justice SANDERS has covered in his opinion a great many of the facts and circumstances, and has inserted a copy of each of the dying statements that were made. See State v. Watts, 52 Nev. 462–467, 290 P. 732.

Dr. Swezy testified at great length and was permitted to illustrate by conversations had with the deceased, Watts, what, in his opinion, proved the deceased to be mentally competent. The answer to the above question is probably best found in a portion of his testimony.

"A. I asked him to explain to me how it was Rosa held him down that morning he couldn't get away from her.

"Q. What explanation did he give of that? A. He said that he couldn't get her to let go of him.

"Q. Anything else? A. I told him, I said that it didn't seem to me that a woman could hold a man and he couldn't get away. He asked me if I ever had one try it.

"Q. And anything else on that? A. Well, I asked him why he didn't tear himself away from her and he said he couldn't do it. I said, 'What did you do?' He said, 'I just begged her to let go of me.' "

■■ We have examined the record with the utmost care and the most minute scrutiny, and conclude that the dying declarations of Watts were properly admitted

in evidence. Every safeguard possible was by the trial court thrown around the defendant in the admission of these dying declarations at the time of their admission and by its instructions to the jury, and the statements then became a matter for the jury to weigh, consider, determine, and decide as to the probability or improbability of the statements as a whole, and as to the mentality of the deceased at the time of making the same, and as to that part of the statement in which the deceased claimed that the defendant, Rosa Watts, was holding him when the fatal shot was fired.

■ The jury were the judges of the facts of the matter. They had all of the evidence before them, and it is not for this court to indulge in any speculative or conjectural theory in this matter.

Third, as to the condition of the mentality of Watts at the time the dying statements were made: Dr. Swezy was the attending physician during all of the time the deceased was in the hospital. He and other witnesses were permitted to testify as to the mentality of the deceased before the jury in laying a foundation for the introduction of the dying statements. He had an opportunity to and did observe the condition of the patient every day from the date of the shooting until the death of the patient. Repeatedly throughout the testimony of this witness there is brought forth the fact that from a period of about two or three days after the shooting, which occurred on the 18th of June, until on or about the 23d or 24th day of July, the physical condition of the patient progressed favorably and his mentality was quite clear; that on or about the 27th of July "the patient was failing fast," "and for four or five days prior thereto was slipping pretty fast." Between the 27th of July and the 9th of August his physical condition was progessively bad, but the condition of the mentality of the patient upon the 27th of July and the 9th of August, the days upon which the dying declarations were made, was quite clear. To set forth all of the testimony of this witness would be to unnecessarily incumber the opinion. The doctor gave illustrations

for his reasons and opinion as to the mentality, and was permitted to repeat conversations had with the patient in his presence. The doctor further testified that Watts would talk normally and rationally. One illustration was when one of the Deihl boys was permitted to visit the patient in the doctor's presence. A portion of the testimony is here set out:

"A. I went and picked him (meaning Bobby Deihl) up and took him up there.

"Q. Don't give us too much detail. Go to the point. A. All right. He said, I knew him and he knew me. He knew Bob. Shook hands with him. Bob told him how well he was looking; how all his friends were inquiring about him. That pleased him. He laughed; said, 'That was good.' I said, 'I guess one thing in Doc's favor he never dissipated any.' Bob said, 'I saw him dissipate once out at McDermitt.' I said, 'Who was with you?' He spoke up and said, 'Joe Duarte,' the deceased said that himself. He said, 'I didn't make any disturbance,' but he said, 'Bob created a whole lot of fun.' I said, 'Bob, is that right?' He said 'Absolutely right.' That was one incident."

Another illustration is given in a conversation had with Mrs. Caledonia Swezy in the doctor's presence. A portion of the doctor's testimony is as follows:

"A. One evening I took Mrs. Swezy up, one Sunday, and he had never met Mrs. Swezy, had only seen her— I don't think she had ever met him personally, that I know of. When she walked into the room I said, 'Doc, here is somebody to say hello to you.' He said, 'How do you do Mrs. Swezy.' She said, 'How do you do Mr. Watts,' she says, 'how do you feel?' He says, 'I am feeling pretty good.' She says, 'The heat bothers you doesn't it; it is pretty warm.' He says, 'No, it doesn't bother me much; they keep me comfortable.' Mrs. Swezy went out. I thought that was a reasonable rational normal response or normal action."

"Q. When was it he told you he knew everything that was going on down there that morning? A. Oh, yes, he told Mrs. Swezy at that time. I said, 'You know

Mrs. Swezy.' He said, 'Yes.' I said, 'Where did you see her before,' and he said, 'I seen her down there,' I said, 'Did you see her at any other time,' or something to that effect. He said, 'She came over to the house that morning.' I said, 'Who else was there?' 'Mr. and Mrs. Spinner, Mrs. Vandermede, Miss Forde."

Another illustration is given in a conversation with reference to the shooting:

"A. I asked him if he knew who shot him. He spoke about Trousdale; seemed to be afraid, always afraid. I asked him if he was afraid of Trousdale. He said yes; and I asked him why he thought he shot him, and he didn't answer me. I said, 'Was it over money?' He said yes. He told me about going down the road the Monday preceding the shooting; went down in his car. I asked him if he saw any one. He said he saw several tourists. I said 'Did you see anybody else you knew?' He said, 'On my way back Glenn Trousdale was coming down the road very fast.' I said, 'Did he stop?' He said, 'I don't know I came on home.' I said, 'What did you do down there?' He said, 'I don't remember.' That was the Monday before. The afternoon before. When ever he didn't want to tell me he would say I don't remember, or I can't remember. That was the way he had of evading my question or any question he didn't want to tell me."

Caledonia Swezy, the wife of Dr. Swezy, testified as to a conversation had with the patient upon a trip to the hospital, which is set out:

"Q. You remember what you said to him, and what he said to you? A. When I entered the room he said, 'How do you do Mrs. Swezy.'

"Q. Yes. A. And put out his hand, and I think the question was asked him if he remembered me. He said he did, and they asked him when, and he said it was the morning that he was, I can't put in his words, but however, that he remembered Mr., myself and Doctor Swezy, Mr. and Mrs. Spinner.

"Q. Said he remembered seeing you there? A. Remembered seeing us there the morning he was shot.

"Q. Did you have any other conversation with him? A. Doctor asked him to show me the top of his head, which he did, and I told him I was pleased to see him so cheerful and bright, and he thanked me, and I bid him good day and left."

Miss Nora Forde, one of the nurses in attendance upon the patient from shortly after the shooting until his death, testified that his mental condition seemed to be all right after the first few days he was shot; that he was slightly delirious on the 8th of August, but still he knew people and knew what he was doing. She illustrated by repeating a conversation had with the deceased wherein Watts, when asked if he shot himself. said, "No, I didn't," and she asked him why he didn't run away, and he said he couldn't because Rose was holding him down.

There are a few other facts which we desire to briefly point out. When the doctor was summoned on the morning of the shooting, it was the defendant herself who undertook to have the deceased tell the doctor that he shot himself. It was the defendant who, a little later, told Mrs. Swezy that she guessed she would 'phone to Trousdale as he (Watts) wanted to talk to Glenn. It was Trousdale's mother who told District Attorney Brown: "Please don't make this hard on Glenn." It was the defendant who related that she retired for bed shortly after 9 o'clock, and the witness Bogart testified that he had a conversation with the defendant as late as 10:15 o'clock the night before the shooting. The witness Laura Campbell testified that she heard the door of the Trousdale home open and the screen door open and close, and the gate slam, somewhere between the hours of 3 and 4 o'clock on the morning of the shooting. The defendant told the district attorney that she and Watts had agreed to get a divorce. The defendant denied that she went out the back door of her residence when going for the doctor. Other witnesses testified that she went out the rear door and hesitated for a few moments before proceeding across for the doctor. The witness Bogart testified that he heard someone climbing and heard scraping noises like someone drawing

"themselves" over the shed or fence, the sound coming from the front of his cabin which faced the back of the Watts residence, and that he also heard a gate close shortly after he woke up, and sounds of walking on the gravel in the court outside the cabin and at the rear of the Watts residence. Dr. Swezy testified that the deceased had a fear of Glenn Trousdale, and also that the defendant here was not wanted at the hospital by the deceased and that he had to entreat with Rollin Watts to let the defendant come to see him. And the evidence discloses that the defendant was seen riding and talking with Trousdale upon two or three occasions before the morning of the fatal shooting.

We conclude from the evidence and the exhibits before us, and the facts and surrounding circumstances, as pointed out in the record, that there is substantial evidence to justify the verdict of the jury, and that the defendant here could have aided and abetted in the commission of the crime in the way and manner related in the dying declaration of Watts.

■ Over a long period of time the courts of our state have adhered to the well-settled and established rule that no judgment of conviction will be reversed upon the ground that the verdict is contrary to the evidence, if there is any substantial evidence to support it. Constitution, State of Nevada, article 6, sec. 4; State v. Mills, 12 Nev. 403; State v. Buralli, 27 Nev. 41, 71 P. 532; State v. Hunter, 48 Nev. 367, 23 P. 778, 235 P. 645; State v. Boyle, 49 Nev. 386, 248 P. 48.

The former opinion by Mr. Justice SANDERS is adhered to, and the judgment and order appealed from are again affirmed.

NOTE—DUCKER, J., being unable to participate because of illness, Hon. CLARK J. GUILD, Judge of the First Judicial District Court, was designated by the Governor to sit in his place and stead.