THE STATE OF NEVADA, Respondent, *v.* LASZLO
VARGA, Appellant.

No. 3548

April 29, 1949.                    205 P.2d 803.

*George F. Wright,* of Elko, for Appellant.

*Alan Bible,* Attorney General, *Geo. P. Annand* and *Homer Mooney,* Deputy Attorneys General and *Alexander Puccinelli,* District Attorney of Elko, for Respondent.

## OPINION

By the Court, BROWN, District Judge:

The appeal in this case is from a judgment and sentence of the district court based upon a verdict rendered by a jury finding the defendant Laszlo Varga guilty of murder in the first degree, and fixing the penalty at death, and from an order denying a motion for an arrest of judgment, and an order denying a motion for a new trial, made by the district court. The defendant is the appellant, and the plaintiff is the respondent in this court. The parties will be referred to herein as plaintiff and defendant, as in the lower court.

The errors relied upon by the defendant in his appeal are as follows:

1. The verdict is not supported by the evidence.

2. The defendant has been convicted through perjury and fraud, thus taking life without due process of law.

3. The district attorney, in his closing argument to the jury, committed misconduct by bringing in fraudulent and false evidence.

4. The defendant was denied a fair and impartial trial by reason of a prejudiced jury and unqualified jurors, thus violating the Constitution of the United States and of the State of Nevada.

5. Misconduct at the trial by injection of another crime.

6. Error in admitting the defendant's confession and alleged statement to another jail inmate.

7. The court erred in admission of improper evidence over objection.

8. Errors of instruction.

9. Failure to submit to the jury the issue of voluntary or involuntary manslaughter.

10. The motion in arrest of judgment should have been granted.

11. The motion for new trial should have been granted.

12. The state did not establish the venue of the crime.

A careful study of the transcript filed in this appeal discloses the following facts which have been summarized therefrom:

On the evening of March 21, 1948, between the hours of 7:30 and 8 o'clock p. m., the defendant entered the Eagle Service Station, in the city of Elko, State of Nevada, which is situated on the west end of Elko, and asked one Vern Ishmael, who is the constable of Elko Township, whether or not there was a Lutheran Councilor in Elko. The defendant was advised that there was none, and that the nearest one available would probably be in Salt Lake City. He was then directed to the bus depot, and the defendant left the service station.

That same night, sometime between 9 and 10 o'clock p. m., the defendant went to the Commercial Hotel, in Elko, Nevada, and registered, under the name of Laszlo Varga. Previously, the defendant had been directed to the Commercial Hotel by one Father Brockman, the Episcopal minister, who had called the hotel and consented that the charge for the room be placed on the account of the Episcopal Church.

The next day, March 22, 1948, the defendant left the Commercial Hotel about 12 o'clock noon, and went to the east end of town on Highway 40, where he started hitch-hiking. He was picked up by Mr. Aubrey Roberts, who lives at the Tower Service Station, about fifteen miles east of Elko, on Highway 40. While they were traveling together from Elko to the Tower Service Station, the defendant volunteered the information that he had been hitch-hiking for thirty-one days, having started in New York and traveled to California and back. When they arrived at the Tower Service Station, the

defendant walked east on Highway 40 about two hundred or three hundred yards to a point commonly known in Elko as the North Fork Bridge. He had been there for a short time when Henry Gravil, an employee of Bing Crosby, came along in a pickup truck, traveling east on Highway 40, destined for Twin Falls, Idaho. Mr. Gravil picked up the defendant at the North Fork Bridge and continued east on Highway 40. While they were riding, the defendant inquired if there was a minister in Wells, Nevada, and Mr. Gravil answered that he did not know. Upon arriving at Wells, Nevada, Mr. Gravil advised the defendant that he was going to eat, and the defendant stated that he could not eat because he "didn't have any money," whereupon Mr. Gravil volunteered to buy the lunch for the defendant, and they went to the Trail 40 Cafe in Wells, Nevada. After they had finished their lunch, Mr. Gravil continued on his way towards Twin Falls, and the defendant was seen walking from the Trail 40 Cafe towards Highway 40.

Shortly thereafter and on the same day, the defendant, Laszlo Varga, entered the Supp Motor Company, which is located at the extreme east end of Wells, Nevada, on Highway 40, and in a conversation with one Howard Prince, an employee of this company, the defendant asked about a "Council of Churches," stating to Mr. Prince that he had come from New York City and was working his way with the aid and assistance of "these Councils." Mr. Prince told the defendant that he knew nothing about the Council of Churches, but that he did know the Mornings, who were interested in all church work, and that they could probably inform the defendant. Mr. Prince then proceeded to give specific instructions to the defendant as to how he could go to the Morning residence from the Supp Motor Company. In giving the defendant these instructions, he specifically told the defendant that when he reached the block where the Morning residence was located, the

Morning home would be the third house after the apartment house on the corner.· The defendant then left the Supp Motor Company.

Between 2:30 and 3 o'clock p. m., on the afternoon of March 22, 1948, the defendant entered the yard of one Pauline Weeks, who resided immediately next door to Mr. and Mrs. Morning, her house being the third house in the block if you counted the apartment house as number one.  Upon entering the yard the defendant asked where the Presbyterian minister lived, and Mrs. Weeks advised him that the minister lived next door, whereupon the defendant left the Weeks' yard and proceeded to the Morning residence.

The record shows that Mrs. Morning was seen alive at about 2 o'clock p. m., that afternoon, by an employee of the Standard Oil Company, who was delivering stove oil at the Morning residence.

At about 4:50 o'clock p. m., on the same day, the defendant was again seen at the Supp Motor Company, where he cashed a check made payable to himself, and signed by Mrs. Morning, and endorsed "Laszlo Varga." At about 5 o'clock p. m., on the same day, the defendant was seen at the Trail 40 Cafe in Wells, Nevada, where he contacted the proprietor, Ola Dalmonego, and advised her that he had no money, but desired to cash a check, whereupon he exhibited a check to her, made payable to Laszlo Varga, and signed "Billie Rhae Morning." When the defendant was told that she did not cash a personal check, the defendant stated, "A minister's check is always good," and he further advised that the minister had a telephone.  Mrs. Dalmonego checked the telephone directory, but found no listing for the Mornings, whereupon she again refused to cash the check, and the defendant left the cafe.

About fifteen minutes later the defendant returned to the Trail 40 Cafe and this time he engaged one Dottie Supp in conversation, and advised her that he could not get the check cashed, and that he had numerous pennies

in his pocket, but nobody wanted them, and inquired as to bus schedules, and advised the said Dottie Supp that he was going to return to Elko to get work. Miss Supp suggested that he go to the post office, believing that they might take the pennies in exchange for coins of larger denominations.

Sometime between 5: 15 and 5: 30 o'clock p. m., of March 22, 1948, the defendant entered the post office in Wells, Nevada, and attempted to cash the check. When he was advised that they did not cash personal checks, the defendant said, "This isn't exactly a personal check, it is a minister's check." There was some additional conversation between the defendant and the postmaster, and during the course of this conversation the defendant said: "This check isn't any good, I go up and demand *she* give me money for it." Thereafter, at approximately 5: 20 o'clock p. m., the defendant entered the Southern Pacific ticket office in Wells, Nevada. He wanted to purchase a ticket to Elko, but was advised that the next train was scheduled to arrive at 11: 45 o'clock a. m., the next day, on March 23, 1948, whereupon the defendant tried to cash the check, and was again advised by the agent, William Toombs, that he could not cash personal checks. The defendant then left the railroad station and was last seen walking toward Highway 40 in Wells, Nevada.

Mr. Wylie James Emerson, an employee of Insured Driver Way Service of Salt Lake City, Utah, who was driving a United States government fire truck to Sacramento, California, saw the defendant thumbing a ride at the west end of Wells, Nevada, while he was driving west on Highway 40. Mr. Emerson picked up the defendant, and together they proceeded to drive in the direction of Elko, Nevada. While they were traveling between Wells and Elko, the defendant volunteered the information that he was hitch-hiking from New York, and that he had been on the road nineteen days, and was going to San Francisco, California. Mr. Emerson

stated that they passed through Elko to a point about five miles west of Elko, where they ran out of gasoline. The defendant volunteered to return to Elko and buy some gasoline. Shortly thereafter the defendant obtained a ride in a pickup truck which was traveling east on Highway 40.

Between 6 : 45 and 7 : 15 o'clock p. m., on March 22, 1948, the defendant again entered the Commercial Hotel, and the clerk on duty was the same clerk who had been on duty, the previous night, when the defendant first registered into the hotel. The defendant advised the clerk that he desired to pay for his room and cash a check, which check was "on the minister's wife in Wells." The clerk examined the check and noticed that it was made payable to Laszlo Varga, and signed "Billie Rhae Morning," whereupon he cashed the check. The defendant further volunteered the information that he had run out of gasoline and wanted a taxi. Shortly thereafter the defendant left the hotel in company with a cab driver.

At about 7 o'clock p. m., on the same day, the defendant and the cab driver went to the Eagle Service Station, which is the same service station that the defendant visited the previous night, when he inquired as to the whereabouts of a Lutheran Church, and the attendant on duty was the same man, Vern Ishmael, who had been on duty the night before. When asked what he was doing back in Elko, the defendant stated that he was going west. The defendant purchased five gallons of gasoline, and then left in the taxi, traveling on .Highway 40 in a westerly direction. They reached the location where the fire truck had run out of gasoline, put the gasoline into the truck, and the defendant and Mr. Emerson then continued on to Carlin, Nevada, where they stopped at a service station on the highway. The defendant and Mr. Emerson entered a coffee shop, which adjoins the service station, and ordered pie and coffee. While they

were in the coffee shop the defendant proceeded to take out some small change from his pockets, consisting of some silver dollars and forty-five pennies, which the defendant had changed into coins of larger denominations. While they were in the coffee shop a westbound Greyhound Bus marked "San Francisco" stopped at the station. The defendant inquired as to its destination, and then purchased a ticket, and boarded and left on the bus. This was about 8:20 o'clock p. m.

At about midnight on March 22, 1948, Reverend Richard Morning, who had been absent from Wells all day, returned to his home. Upon entering the home, he proceeded to the back bedroom of his house, and discovered his wife dead. She was lying across the bed, near the head of the bed, gagged and tied, hand and foot, by what appeared to be light cords. He also found his child, then about eight months old, dressed in ordinary day clothes, and not prepared for bed, although it was the general practice to have the child prepared for bed each evening between the hours of 6 and 7 o'clock p. m.

Mr. Morning went to the telephone to summon help, and found that the phone wires had been cut, whereupon he left the premises and called the police.

The investigation made by the police disclosed, among other things, that a jar which Reverend Morning generally kept in a bureau drawer and used for small coins received from Sunday school collections was broken and empty. It was further disclosed that a checkbook was laying on the dresser in the same room where Mrs. Morning was found dead, with three checks gone from the checkbook; that all dresser drawers had been opened and the contents disturbed, and that a book of matches from Powell's Luxury Hotel, of Eureka, California, was found in the dining room.

Mr. Homer Murphy, constable of Wells, Nevada, and Dr. Walter E. Kuhn, also of Wells, Nevada, made an investigation at the home of Reverend Morning shortly after midnight, early in the morning on March 23, 1948,

and found Mrs. Morning dead lying across the bed with both hands and both legs tied to the rail of the bed with a towel and an electric light cord. Her knees were flexed, and tied to the back of the bed rail. Her right shoulder was tied with a towel to the head of the bed, to the rail, and another towel between the head of the bed and the body that was tied down to the rail. Also, there was a towel that was twisted up, about as tight as a rope, and that was around her neck, just as tight as it could be pulled, and that was tied down to the side of the bed to the rail. There was a bloody towel over her head, and her head was lying in a pool of blood, and there was some blood on the wall near the head of the bed. Her body was badly bruised generally, and her head was very swollen, eyes closed, and about a four-inch skull fracture with blood and brains oozing out of the fracture. Her mouth was very much pried open, with a pair of women's panties stuffed very tightly in it. Dr. Kuhn stated that death was produced by strangulation, suffocation, or skull fracture, and a combination of the three together.

The evidence also showed that there was a rolling pin found on the bed, about a foot from Mrs. Morning's head.

The defendant was thereafter apprehended in California, and in subsequent statements made by the defendant he disclosed, among other things, that he had resided in Eureka, California, and that Eureka, California had been his last place of residence prior to coming to Nevada.

The facts in this case disclose a most brutal slaying.

Counsel for the defendant lays great stress upon the testimony given by Dr. Kuhn in reference to the length of time that Mrs. Morning had been dead prior to the time that she was examined by the doctor, at approximately 1 o'clock a. m. on March 23, 1948. Dr. Kuhn testified as follows:

"Q. And did you ascertain when you made your

examination at about 1: 00 o'clock· A.M. the length of time that Mrs. Morning had been dead? A. In my opinion she could have been dead about six or seven hours."

■ Counsel for the defendant would have it appear that such testimony positively precludes her death prior to 6 o'clock p. m., on the evening of March 22, 1948. We do not so interpret his testimony, and feel that it does not justify such an inference. Dr. Kuhn merely gave an opinion that Mrs. Morning could have been dead six or seven hours prior to 1 o'clock a. m. on the morning of March 23, 1948. There is no testimony in the record which absolutely and positively fixes the time of her death. Therefore, the contention made by counsel for the defendant that the defendant could not have committed the crime, due to the fact that he departed from Wells prior to 6 o'clock p. m., on March 22, 1948, is not well founded, and the jury was fully justified in rejecting this contention.

Thereafter, and while the defendant was in the Elko County jail, he made three different statements with reference to the death of Mrs. Morning.

On April 15, 1948, the defendant said to Deputy Sheriff Jess C. Harris, in the Elko County jail, in a very low and controlled tone of voice: "I kill Mrs. Morning, I did it." Later, on the same day, after having been warned, by both the district. attorney and the deputy sheriff, that any statements made by the defendant would be used against him, he made the following voluntary statement, in the presence of the deputy sheriff, the district attorney, and the secretary of the district attorney, to-wit:

"I, Laszlo Varga, tell all story about murder at Pastor's wife in Wells, to Mr. Puccinelli and Mr. Harris and Mrs. Sadie Unamuno, in Jail Office in Court House in Elko, on 15 April, 1948. I tell story free and voluntarily. Nobody give me anything to make me tell, nobody beat me or hurt me in this Jail, I tell story

myself and I know that what I tell can be used against me.

"My name is Laszlo Varga, I born Hungary, August 26, 1929. I came to America September 30, 1946. I came from New York City to Eureka, California about forty-five days ago now. I leave Eureka, California with Joseph Barbas, at night time for twelve-thirty in a bus station, I and Joseph for taxi company Number 727. I leave Eureka with Joseph because Joseph come to see me, he want to take money which belong to Laseo Fish Company. I tell him 'No.' He come back second night. Second night I work myself. I went out on street, I see radio car and I tell them and then I go home. I go to work second night and I see one man who tell me he give me better work than Laseo Fish Company. Then Joseph make me leave Eureka. We leave Eureka in bus and go to San Francisco. Before I leave Eureka I go tell police I leave Eureka because one time before F.B.I. tell me I have to tell when I leave. They think I come from Russia. I no come from Russia, I just open my mouth big.

"When Joseph and I leave Eureka we go San Francisco in bus. From San Francisco we come on Highway Forty—Ninety-Nine. We come to Elko Sunday night about six o'clock, 21st March.

"Sunday night I get money from minister, and one room. Joseph he no stay this town, he leave, tell me he say 'I go next town, you meet me Number Forty Road outside town.' Next day, Monday, I get up about twelve o'clock, something like this, and I go on Number Forty Road, hitch-hike. One man in truck give me ride fourteen mile other side Elko, other man with cut lip give me another ride thirty-seven one-half mile. We get to other town. When we get to this town this man who give me second ride buy me eat. He buy me three scrambled egg, one cup coffee.

"After I finish eat I go to this man's truck and get my overcoat, then I walk to Number Forty Road and

I meet Joseph on road Number Forty other side town. Joseph say 'Let's go back to town,' I say, 'What you want in town, you can't get job?' He say 'I don't want job.' I say 'I go myself.' He say 'You go as far as my gun shot,' so I stop. I go back town with Joseph. When we go back town we stop at service station. Joseph go in and he come back and see me and he ask 'Where you get money in Elko last night?' I tell him 'Pastor of church.' Then he say 'Let's go to town and see pastor.' So then we go to pastor's house. Together we murder the woman dead.

"In house of pastor we find pastor's wife. I show her ship of cards, we go inside house. Pastor's wife want to make for me eat and I say 'Thank you I not hungry, I just eat in restaurant.' She show me letter in German and ask if I read German. Joseph know German so he read for change from German to English. Then Joseph tell me 'Take away his money.' So Joseph hold the woman, I tie his hands, this was in bedroom. After I tie hands this woman, Joseph ask questions, he speak good English, not just speaking, he read and writing everything. She say she no have any money, 'but I got check.' He tell 'Where be the check?' She say 'On desk, outside on the desk.' Desk is in room, front part of house on left side when you go in. Joseph go get the check, I get lady's wallet, we take them to bedroom and I give wallet to baby. Joseph ask pastor's wife how she writing name, she show and Joseph write check. Then I say, 'Let him go, this woman, not bad enough you take his money?" And he say, 'No, hit him in head.' Joseph got gun in his pocket, shoot seven pieces. He got small belt with ammunition, thirty-five pieces. He take gun and he make me hit lady on head with one piece of wood. He hit him first, I hit him second. When I tie up pastor's wife hands Joseph put something in her mouth so she no can talk, she can answer questions with head. After we hit woman on head with wood, I put baby on bed and give him two pieces bread and

mother's wallet, then I leave the house. I have two checks.

"Joseph stay in house with rubber gloves his hands. Joseph say he meet me in Michigan, Detroit, so I go town and cash one check in service station. I go bus station, post office and try to cash check but can't cash check. When Joseph stay in house and I come out I don't know what to do, so I scared and I start to run, I don't know where I going. Joseph stay in town in the house, what time he leave I don't know. I catch ride with one man in red truck. I come to Elko, other side, we run out of gas. I come back Elko, cash one check at hotel, take taxi, buy gas and take to truck. We put gas in truck and go another town.

"In this other town I get bus, I go California. I want to go back to Eureka for work where I can work. Where I work before have good time, these people like me. In this other town where I catch bus I give lady in restaurant lots pennies which I get from pastor's house. Pastor have money, about one hundred pieces. Joseph take this money from Pastor's house and give it to me. I give these to lady in restaurant which I catch bus.

"This paper has been read to me and it is the truth. Nobody forced me in any way to say this. What I say is my own idea and I sign my name before A. L. Puccinelli and Mr. J. C. Harris.

"(Signed:) Laszlo Varga"

Later, on May 4, 1948, the defendant dictated the following statement in the Elko county jail, which was written down by Jerry Howard, who was a jail inmate, and after having been read back to the defendant, Laszlo Varga, was signed by him, to-wit:

"Your Honor; This is my true statement. My real name is Laszlo Varga. My born is Hungarian, Birth place is Tet Hungary, August 26, 1929. Your Honor, can you inform me why do I have to go to court too many times? Today is my twentieth day since I plead guilty on my side, but I can not plea guilty for Joseph

Barabas side. This is true, I and Joseph murdered the woman. Woman's name is Mrs. Morning, on March 22, 1948. That's all of it I know. When I left the house, Joseph stayed in the house after what happen I don't know. This is all of it I know. Signed, Laszlo Varga. Your Honor, I told my lawyer I am guilty, but, he said he do not accept it, and I don't want a lawyer. So sentence me now. Because, Joseph and I murder the woman. Your Honor, word what I say are true. Eureka, California, Lascia Fish Company, I work there. March 18, 1948, Joseph Barabas come to see me. When I was working in the kitchen. About 12:00 o'clock and Joseph want to steal Lascio Fishes Company's money. He went in the office and wanted to break the safe and I was in office, and I went to the other office, on the wall there was five different kinds of guns, and I took one, and told Joseph to leave the safe alone and get out. And, he got out. I got home one o'clock and I went back two o'clock and I see Joseph, and I told I want to talk to you, and he came to my house and I told him to wash yourself and eat. When he was eating I told the street police the description of Joseph and I went home. When I went home, Joseph was not home and went to bed. Twenty minutes later Joseph came back."

This statement was later delivered to the deputy sheriff, Jess C. Harris, by the defendant, Laszlo Varga.

While in the two statements made by the defendant he refers to a Joseph Barbas or Barabas, as having been connected with the commission of the crime, it was undoubtedly inconceivable to the jury how the defendant could have been in the town of Wells, Nevada, for several hours with this other person and not be observed with him by anybody at any time, especially in view of the fact that the defendant was seen alone and not with anyone else, by so many people and at so many different places. It can well be when all of the circumstances of the case are considered, that the defendant endeavored

to relieve his own conscience by sharing the perpetration of this atrocious act with some fictitious character.

▮▮ Upon a thorough analysis of all of the evidence, we feel that the verdict of the jury is amply supported by the evidence. It is a well settled rule that no judgment of conviction will be reversed upon the ground that the verdict is contrary to the evidence if there is any substantial evidence to support it. State v. Hunter, 48 Nev. 358, 367, 232 P. 778, 235 P. 645; State v. Boyle, 49 Nev. 386, 248 P. 48; State v. Watts, 53 Nev. 200, 296 P. 26; State v. Soares, 53 Nev. 235, 296 P. 1081; State v. McNeil, 53 Nev. 428, 4 P.2d 889; State v. Squier, 56 Nev. 386, 54 P.2d 227.

Number II and Number III of the errors claimed by the defendant will be considered together. It appears from the record that following the opening argument by the state, counsel for the defendant stated, in substance, that the defendant could not have committed the crime charged because had he done so he undoubtedly would have left his fingerprints on some object in the Morning residence, and that there was a complete absence of proof by the state of any fingerprints of the defendant. In the closing argument by the district attorney, he made the following statements:

"Before I go into the discussion of that, however, let's go to another factor, the absence of finger prints. I can't explain that, unless I again refer to his statement. I can't answer why there were no finger prints. I wish that I could, but I can't tell you, excepting that he tells me in this statement, 'Joseph stay in house, with rubber gloves his hands.' Therefore, I will say that the absence of finger prints, is because this buddy of Laszlo's stayed in the house and that he operated with rubber gloves, and that that is why we couldn't find any finger prints of he and Barbas."

The following discourse was then had between counsel and the court:

"Mr. Wright: If the Court please, May I ask to have

the record read where there is any evidence that there are no finger prints found?

"Mr. Puccinelli: That was argument put up to the jury that there was no finger prints in the house, and I sought to answer it, if your Honor please.

"The Court: I think the argument is fair, Mr. Wright.

"Mr. Wright: I think he can say as far as there is no evidence, there are not finger prints. There is evidence there is no finger prints, because there is no evidence—no finger prints found.

"Mr. Puccinelli: I will say we couldn't find a finger print.

"Mr. Wright: If Mr. Puccinelli was to testify, he should have testified in order, and not testify now, and I ask that the jurors be instructed to disregard the remarks of the District Attorney as not evidence to this case.

"The Court: Well, the distinction is very slight, Mr. Wright. You pointed out that there was no proof of finger prints. The District Attorney confessed that he was unable to find finger prints. Would you state your distinction again?

"Mr. Wright: The evidence of the case has been closed for testimony, and the District Attorney has been indentified as being there. Now, he is trying to testify, he testifies. You can not argue this case to the jury and he was not sworn and he has not testified, and the officer has not stated whether there were or were not finger prints found, and therefore his statement that I'll go further and say there were no finger prints—there is no evidence in the record of that, if the Court please, and if Mr. Puccinelli decided to testify in the case, why didn't he testify then as a witness, not now and say, 'I'll go further and say that we never found any finger prints.' And, I wish the jury to be instructed to disregard it, any attempt of testimony by Mr. Puccinelli as not evidence to this case, and also, if

there is any evidence on the subject that there are or are not finger prints, that it be read to the jury and let the jury be so instructed.

"The Court: The request will be denied, but the jury will be instructed to disregard any statement or confession by Mr. Puccinelli in open court that they were unable to find finger prints.

"Mr. Puccinelli: If the Court please, inference was made by Mr. Wright as to absence of finger prints.

"The Court: That is correct. He argued on that point, and you may answer.

"Mr. Puccinelli continued his summation to the jury.

"The Court: The Court now calls for any additional instructions made necessary by the arguments.

"Mr. Puccinelli: The State has none, if your Honor please.

"Mr. Wright: If the Court please, I think that one phase is covered by the instructions. Let me check. If the Court please, I would like to have one additional instruction.

"The Court: Made necessary by the arguments?

"Mr. Wright: Yes, if the Court please.

"The Court: Do you submit it?

"Mr. Wright: Yes, by—I think probably in writing, or I can tell you without telling what it is to the jury in private. I think—may I approach the Bench?

"The Court: You may approach the Bench. (At this point, Mr. Wright and Mr. Puccinelli approached the Bench.)

"The Court: Gentlemen of the Jury, your are instructed that statements made by counsel in argument is not evidence."

■ It is obvious to the court that the district attorney was replying to the argument of counsel for the defendant, when for the first time the absence of fingerprints was injected into the case by counsel for the defendant himself, and that reference was made by the district attorney only to the absence of fingerprints of the

defendant. Consequently, the defendant is in no position to complain, and was not prejudiced by the remarks of the district attorney. Further, such remarks did not constitute perjury or false or fraudulent testimony. In addition, at the request of counsel for the defendant the court instructed the jury as follows:

"You are instructed that statements made by counsel in argument is not evidence."

■ Specification of Error Number IV, that the defendant was denied a fair and impartial trial by reason of a prejudiced jury and unqualified jurors, thus violating the Constitution of the United States and of the State of Nevada, we find to be without any merit. The examination of the jurors on voir dire consumes approximately two hundred pages of transcribed testimony.

The prospective jurors were examined as to an "unqualified opinion" with reference to the guilt or innocence of the defendant, and all stated positively that they had no definite or fixed opinion, but would be guided by the evidence and the law given by the court.

■ The defendant specifically cites three jurors as being disqualified: Thos. H. Payne, Pete Elia and Robert L. Kane. The record discloses that Payne did not serve, due to the fact that he was excused by the defendant on the fourth pre-emptory challenge; that Pete Elia could have been removed by the defendant exercising a pre-emptory challenge. Therefore, the defendant can not claim any prejudicial error as to these two jurors.

With reference to the juror Robert L. Kane, although he stated that he had formed and expressed an unqualified opinion as to the guilt or innocence of the defendant, upon a careful analysis of his whole examination, the record disclosed the following:

"Q. Is that a fixed opinion? A. I don't think so.

"Q. In that connection, if you were selected as a juror, could you enter in and upon the deliberations

and be governed exclusively by the testimony as adduced in this courtroom and the instructions as given to you by the Court? A. I would.

"Q. In other words, Mr. Kane, if selected as a juror, do you feel that you could act fairly and impartially to both the State and the Defense? A. I think so.

"Q. Do you know of any reason, Mr. Kane, why you would not make a fair and impartial juror? A. No, I don't.

"Q. If you did, you would so state? A. I would."

Again, under examination by defendant's counsel:

"Q. And have you discussed the case with any of the officials connected with the County? A. No, I haven't.

"Q. Have you an opinion concerning the guilt or the innocence of the defendant? A. I have.

"Q. Now, is that opinion a fixed opinion? A. No.

"Q. And is it an opinion that would affect your deliberations in this case? A. No.

"Q. Is it an opinion that would place a greater burden or proof on either one side or the other? A. I don't think so."

Again under examination by the district attorney:

"Q. Do you understand the meaning of 'unqualified opinion'? A. Well, I think I do.

"Q. What do you understand as being an unqualified opinion? A. You have an unqualified opinion, that would be one where you wouldn't be able to change your frame of mind. You would have a set opinion.

"Q. Therefore, your opinion is not set? A. No.

"Q. You have an opinion? A. Yes, I have an opinion.

"Q. Now, if you were selected as a juror in this case, would you set that opinion aside? A. I would.

"Q. And therefore, would you be governed exclusively by the testimony as testified to by the witnesses during this case? A. I would.

"Q. Therefore, whatever decision you might reach,

would be the result exclusively of the testimony and of the Court's instructions? A. I would.

"Q. And what you previously heard or read would not in any way influence you in reaching that decision? A. That is right."

■ In view of such testimony by Mr. Kane, the court is satisfied that he was not a disqualified juror under the law. State v. Millain, 3 Nev. 409; State v. Williams, 28 Nev. 395, 82 P. 353.

Counsel for the defendant stated in his brief, "but the jurors were all so bad that it was a question to try to get along with Mr. Elia or to gamble on the next one."

If such were actually the case, counsel for the defendant had a remedy under the law, which was to request a change of venue. This was not done.

Under Specification of Error Number V, the defendant contends misconduct at the trial by injection of another crime. During the examination of Jess C. Harris as to the date when the note was delivered to him by Laszlo Varga, which had been previously taken down in writing by the jail inmate, Jerry Howard, he testified as follows:

"It was on the day the defendant struck Wilbur Hines, the jailor."

Upon objection by counsel for the defendant, which was sustained, the answer was stricken, and the court immediately instructed the jury to disregard the answer given by the deputy sheriff. Again, the deputy sheriff testified with reference to a conversation with the defendant, Laszlo Varga, on the morning of June 11, 1948, as follows:

"It was immediately after the defendant had gotten out of his cell, and torn, what we call the bull pen in general, that——"

Upon the objection by counsel for the defendant, the answer was stricken and the jury was instructed to disregard the answer given by the witness.

The deputy sheriff then testified as follows:

"Q. You asked the defendant why he didn't behave himself. He said, 'Why should I behave myself? I act crazy down here in jail all the time, then when you take me to Court I act crazy again. I make everybody believe I am crazy. The judge will think I am crazy, and send me to a hospital for two weeks, and then send me back to my country.'"

■ There was no attempt on the part of the district attorney to inject into the trial, or prove in any manner, the commission of any other crime. The remarks made by the deputy sheriff were immediately stricken by the court, upon objection by counsel for the defendant, and the jury were admonished, in each instance, to disregard the answers. Under such circumstances the defendant could not have been prejudiced.

■ With reference to Specification of Error Number VI, that the trial court committed error in admitting the defendant's confession and alleged statement to another jail inmate, the court finds that all statements made by the defendant were entirely voluntary on his part, and that there is a complete absence of proof that any force, duress, or promises of leniency were made by anyone to induce the defendant to make such statements. Further, the record shows that in one instance, before the defendant made the statement which was taken down by the district attorney's secretary, the defendant was expressly warned by the district attorney and deputy sheriff that any and all statements made by him would be used against him. Certainly, under such circumstances no error was committed by the trial court in admitting the various statements, made by the defendant in evidence.

Under Specification Number VII the defendant contends that the following evidence was improperly admitted:

1. Dr. Kuhn was asked whether or not the skull fracture could have been caused by the rolling pin. An objection was made by the defendant, which was overruled, and the doctor answered in the affirmative.

2. The rolling pin was admitted in evidence over objection by the defendant.

In both instances we find that a proper foundation was laid for the admission of such evidence, and that no error was committed by the trial judge in admitting the same.

As to Specifications of Error Number VIII and IX, with reference to instructions on manslaughter which were refused by the court, and a form of verdict for manslaughter, which was also refused by the court, we find, after consideration of all of the evidence, that the court, in its sound discretion, properly made such refusals on the ground that there was no evidence to justify such instructions and such a verdict.

Specification Number X, in reference to the trial court's denial of the defendant's motion in arrest of judgment, was waived by the defendant.

The denial of the motion for a new trial, under Specification Number X, deals with Specifications of Error Numbered II and III, with reference to statements made by the district attorney, in his closing argument, with reference to the absence of fingerprints of the defendant, and is heretofore covered in this opinion. No proper showing having been made to the trial court to justify the granting of a new trial, the order denying the same was within the sound discretion of the court and thoroughly justified under all of the evidence produced at the trial. State v. Bauer, 34 Nev. 305, 122 P. 76; section 11032, N.C.L.1929, as amended.

Under Specification Number XII, the defendant contends that the plaintiff did not establish the venue of the crime as being in the county of Elko, State of Nevada.

When all of the evidence introduced at the trial is considered as a whole, there is ample proof that the crime was committed in Wells, Elko County, Nevada. Deputy Sheriff Jess C. Harris testified as follows:

"Q. Will you state your name, please? A. Jess Harris.

"Q. And, where do you live, Mr. Harris? A. Elko, Nevada.

"Q. And, do you occupy any official position? A. I do.

"Q. And, what is that official position? A. Undersheriff, County of Elko.

"Q. Were you such Undersheriff on the 22nd and 23rd days of March of this year? A. I was.

"Q. Now, I will ask you to state whether or not, in your capacity as Undersheriff of Elko County, you were directed to proceed to Wells in the early morning of March 23rd, 1948? A. I was.

"Q. And, at whose direction? A. Sheriff Smith's.

"Q. And, at what time did Sheriff Smith direct you to Wells? A. Approximately 12:45 A.M., March 23rd, 1948.

"Q. And, did you proceed to Wells? A. The message was to pick the District Attorney up, and proceed to Wells, which I did.

"Q. And, did you, in company with myself, travel to Wells? A. We did.

"Q. What time did you arrive in Wells? A. Approximately 1:30 A.M.

"Q. On the morning of the 23rd? A. 1948.

"Q. And where, if anyplace, did you go Mr. Harris? A. We drove to the Southern Pacific Ticket Office.

"Q. And, from there where did you go? A. We met Officer Murphy at the ticket office, and then drove to the Morning home.

"Q. And upon arrival at the Morning home, what, if anything, did you do? A. Upon entering the doorway, Officer Murphy, together with Officer Dansie, took us to the back bedroom on the right side of the house.

"Q. And, upon arriving at this particular bedroom, what, if anything, did you note? A. After stepping into the bedroom, I noticed a body lying on the bed.

"Q. Do you know—strike that. Did you know the identity of the body that was lying on the bed? A. No, except that it was a female person.

"Q. Incidentally, Mr. Harris, did you know Mrs. Rhae Morning during her life time? A. No sir.

"Q. Or did you know Mr. Morning prior to that date? A. No, sir.

"Q. At the time that you entered the bedroom that you mentioned, did you make an examination of the bedroom and the body? A. Yes. There was an investigation made."

Such testimony considered with all of the other testimony of the other witnesses positively places the scene of the crime in Wells, Elko County, Nevada.

We find that none of the errors assigned by the defendant justify a reversal of the judgment and sentence and order denying the motion for a new trial made by the district court.

It is therefore ordered that the judgment of conviction and sentence of the death penalty upon the defendant, Laszlo Varga, and the order denying the motion for a new trial, are hereby affirmed, and the district court is hereby directed to issue a warrant of execution to carry into effect the judgment and sentence heretofore entered, as provided by law.

BADT and EATHER, JJ., concur.

HORSEY, C. J., being absent on account of illness, the Governor commissioned Hon. MERWYN H. BROWN, District Judge of the Sixth Judicial District, to sit in his stead.